UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re                                                         **Chapter 7**

POSEIDON POOL & SPA                                           **Case No. 805-87603-478**
RECREATIONAL, INC.,                                           **Hon. Dorothy T. Eisenberg**

                            Debtor.
------------------------------------------------------------X
ANDREW M. THALER, Trustee,                                    **Adversary Proceeding**
Estate of POSEIDON POOL & SPA                                 **No. 806-8222-478**
RECREATIONAL, INC.,

                            Plaintiff,

          - against -

ESTATE OF VINCENT J. ARBORE, Deceased,
DIANE ARBORE, in her capacity as Executrix
of the Estate of Vincent J. Arbore, DIANE
ARBORE, ANN ARBORE, PETER ARBORE,
JAYVIN ARBORE, ALLISON ARBORE,
MICHAEL ARBORE, KATHERINE ARBORE,
ALAN ARBORE, JAMES ARBORE, ROSA
DINICOLO and RITA CANNILLO,

                          Defendants.
------------------------------------------------------------X

**DEFENDANTS' PROPOSED
FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

JASPAN SCHLESINGER LLP
Attorneys for Petitioner
300 Garden City Plaza
Garden City, NY 11530
(516) 746-8000

## PROPOSED FINDINGS OF FACT

## HISTORICAL FACTS AND STATE COURT ACTION

1. Vincent Arbore ("Arbore") was an officer, director and shareholder of the Debtor.

2. Arbore owned ten (10) shares of stock (the "Shares") in the Debtor.

3. On or about May 24, 2002, the Debtor redeemed ten (10) company shares of stock held by Arbore for the purchase price of $450,000.00.

4. This redemption was not pursuant to an ordinary buyout of a shareholder's interest but was pursuant to a so-ordered stipulation of settlement ("Stipulation"), dated May 28, 2002, in the action entitled Vincent J. Arbore, individually, and as a shareholder of Poseidon Pool & Spa Recreational, Inc. a/k/a Pool & Spa Recreational, Inc. v. Poseidon Pool & Spa Recreational, Inc. a/k/a Pool & Spa Recreational, Inc., Timothy Greco, Kathleen Gartner and Joseph Gartner, Supreme Court of New York, Nassau County Index No. 01-013666 ("Action").

5. The action was commenced by Arbore based upon allegations that the other shareholders of Poseidon, most notably Joseph Gartner, had misappropriated approximately $1.5 million of corporate funds.

6. Under the Stipulation, the Debtor agreed, inter alia, to execute and deliver a redemption agreement ("Agreement"), a promissory note ("Note") and guarantee to Arbore.

7. In connection with the Agreement, and pursuant to the Stipulation, the Debtor executed and delivered to Arbore a Note in the principal amount of $400,000.00.

8. Additionally, contemporaneously with the Note, and pursuant to the So Ordered Stipulation of Settlement, the Debtor and Kathleen Gartner, Joseph Gartner, and Timothy Greco, individually, each executed a Guarantee and Pledge Agreement (the "Guarantee").

9. Contemporaneously with the closing, Arbore resigned his position as an officer, director and employee of the Debtor. In doing so, Arbore also released all claims he may have had against Poseidon in reliance on the Debtor's representation in Section 3.03 of the Agreement which provided that "[t]he Company is <u>solvent</u> and the redemption contemplated hereby will not impact negatively any creditor of the Company."

10. Arbore died in September 2002, after which payments under the Agreement were made to Arbore's Estate.

11. In or about September 2005, the Debtor defaulted on its obligations under the Agreement.

## DEBTOR'S BANKRUPTCY

12. In or about October 2005, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

13. Arbore was not an officer or director of the corporation at the time of filing.

14. The Defendants herein sought the appointment of a trustee on or about August 16, 2006.

15. Andrew Thaler was appointed trustee on or about September 5, 2005, and on or about September 15, 2006 he sought to have the Chapter 11 bankruptcy converted to a Chapter 7 bankruptcy.

16. On or about September 21, the bankruptcy was converted.

## ADVERSARY PROCEEDING

17. On or about March 30, 2007, the Trustee commenced the instant adversary proceeding against the Arbore Defendants, alleging that payments made under the Agreement violated section 513 of the Business Corporation Law ("BCL").

18. The payments sought to be recovered are all pre-petition payments in connection with the settlement of the Action.

19. On January 25, 2009, a hearing as to the issue of the Debtor's pre-petition solvency was held before Hon. Dorothy T. Eisenberg.

**RECORDS OF THE DEBTOR**

20. The Debtor did not maintain any inventory records.

21. The Debtor estimated the value of its inventory by employing the gross profit methodology.

22. The Debtor did not maintain any records of accounts receivable.

23. The Debtor did not maintain any records of accounts payable.

24. The Debtor's general ledger values inventory and accounts payable the same for each and every quarter during a given year.

**SOLVENCY AND SUPLUS OF THE DEBTOR**

25. Debtor was solvent at the time the Agreement was executed on May 24, 2002.

26. Debtor was solvent at each and every time an installment payment was made to Abore or his estate under the Agreement.

27. Debtor was not rendered insolvent by any installment payment that was made to Abore or his estate under the Agreement.

28. Each and every payment made by the Debtor pursuant to the Agreement was made from the Debtor's surplus.

# CONCLUSIONS OF LAW

## PLAINTIFF FAILED TO MEET HIS BURDEN OF PROOF AS TO DEBTOR'S INSOLVENCY

1. To recover payments made under a redemption agreement, it is well settled that the burden is on the Debtor.[1] <u>Rehberger v. MRW Group, Inc.</u>, 2008 U.S. Dist. LEXIS 27045, *7 (E.D.N.Y. 2008).

2. In order to meet its burden, the Debtor must establish that either: (1) the agreement is invalid because the corporation was insolvent at the time of execution, or; (2) at the time installment payments were made under the agreement, the corporation was insolvent or lacked the necessary surplus to make the required payments. See <u>Nakano v. Nakano McGlone Nightingale Adver., Inc.</u>, 84 Misc. 2d 905, 908, 377 N.Y.S.2d 996, 1000 (Sup. Ct. New York Cty. 1975); see also <u>Rehberger v. MRW Group, Inc.</u>, 2008 U.S. Dist. LEXIS 27045, *7 (E.D.N.Y. 2008) ("It is well settled that the burden is on the corporation to establish that, at the time payments were to be made . . ., it lacked the necessary surplus to make the payments or would thereby have been rendered insolvent" (internal quotations omitted)); <u>Vowteras v. Argo Compressor Service Corp.</u>, 83 A.D.2d 834, 835, 441 N.Y.S.2d 562 (2d Dep't 1981).

3. Where such proof is lacking, "<u>it is incumbent upon the trial judge to award judgment to the shareholder</u>, even where the corporation, at the time of trial, is without sufficient surplus and is, in fact, insolvent." <u>Nakano</u>, 84 Misc. 2d at 908 (emphasis added).

4. Insolvency is defined as a corporation's <u>inability to pay debts as they become due</u> in the usual course of business. BUS. CORP. LAW § 102 (a)(8) (2010) (emphasis supplied).

---

[1] Courts have allowed trustees in bankruptcy to plead Section 544(b) to avoid a transfer under BCL § 513. If the trustee is successful then the trustee can utilize Section 550 to recover directly from a shareholder any consideration received in connection with a redemption which violated the provisions of BCL § 513.

5. The BCL definition of insolvency is an equitable one which differs from the concept of insolvency as set forth under the Bankruptcy Code. See Official Creditors Comm. of Indus. Ceramics, Inc. v. Industrial Ceramics Assoc., 253 B.R. 323, 334 (W.D.N.Y. 2000).

6. In determining whether a corporation was equitably insolvent, "[t]he fact that at a given time the liabilities of the corporation may exceed its corporate assets is not in itself conclusive of the question." Coffman v. Maryland Pub. Co., 167 Md. 275, 285 (M.D. 1934) (cited by Vowteras v. Argo Compressor Service Corp., 83 A.D.2d 834, 835, 441 N.Y.S.2d 562 (2d Dep't 1981)). Instead, evidence that monthly income meets or exceeds expenses and that bills are timely paid supports a finding of solvency. Vowteras, 83 A.D.2d at 835.

7. The Plaintiff herein has utterly failed to meet its burden of proof on the issue of insolvency and, as such, judgment must be awarded to the Arbore Defendants. Id.; see also generally Rehberger v. MRW Group, Inc., 2008 U.S. Dist. LEXIS 27045 (E.D.N.Y. 2008).

8. The Plaintiff has not produced any evidence that the Debtor was unable to pay its debts as they came due in the ordinary course of business.

9. In fact, at no time did Bernard Sandler, the Plaintiff's expert and an accountant, testify that the Debtor was not able to pay its debts as they came due prior to the Debtor's filing for bankruptcy. Indeed, Mr. Sandler admittedly could not determine "with any certainty" what the Debtor's actual earnings were for any quarter, much less make a determination as to whether earnings were sufficient to cover expenses (Tr. ¶¶ 78:14-78:22).[2] Instead, Mr. Sandler testified only as to his calculation of the corporation's profitability based upon his analysis of the admittedly incomplete books and records maintained by the Debtor.

---

[2] "Tr." Denotes a reference to the transcript of the insolvency hearing before Hon. Dorothy T. Eisenberg held on January 25, 2010.

10. Calculations of a corporation's equity alone do not prove insolvency. Instead, evidence that a corporation pays its bills on a "reasonably timely basis" supports a finding of solvency. See Rehberger, 2008 U.S. Dist. LEXIS 27045 at *9 (E.D.N.Y. 2008).

11. For example, in Rehberger v. MRW Group, Inc., the U.S. Bankruptcy Court for the Eastern District of New York found that MRW Group was equitably solvent. The Court's conclusion as to solvency was reached on the basis of its ability to pay its debts as they came due in the ordinary course of business. More specifically, the Court's finding of solvency was based upon the fact that the Defendant paid all of its bills on a "reasonably timely basis" during the relevant time period, and that the Plaintiff had failed to produce any evidence to the contrary. 2008 U.S. Dist. LEXIS 27045 at *9.

12. The Plaintiff herein has not offered a scintilla of evidence of the type offered in Rehberger as to an ability or inability of the Debtor to pay its debts as they came due in the ordinary course. As it is Plaintiff's burden to prove insolvency, this lack of evidence is fatal to the Plaintiff's claim that payments under the Agreement should now be avoided. See Nakano, 84 Misc. 2d at 908.

13. In contrast, the facts at bar do not remotely resemble cases in which a Debtor was found to be insolvent. In Official Creditors Comm. of Indus. Ceramics, Inc. v. Industrial Ceramics Assoc., the U.S. Bankruptcy Court for the Western District of New York found that the Debtor, Industrial Ceramics, had proven that it was equitably insolvent. 253 B.R. 323 (W.D.N.Y. 2000). This finding was based upon internal memos of the Debtor describing efforts to make partial payments in full satisfaction of debts past due because full payment could not be made. Id. at 332. The Court took further note of an internal memo stating that the Debtor's financial excess had been exhausted such that the Debtor could not "withstand any minor problems which

tend to be fairly common occurrences." Id. Also persuasive was the Debtor's President's deposition testimony, in which he stated: "I don't think in the ten years we ever paid our payables when they became due. We lived in constant not paying payables when they became due." Id. The Plaintiff herein has not offered any evidence whatsoever of the type relied upon in Official Creditors.

14. The trial transcript is simply bereft of any testimony that bears on the crux of the equitable insolvency issue.

15. Plaintiff, therefore has not met his burden of proving equitable insolvency and judgment should be awarded to the Arbore Defendants. See Nakano, 84 Misc. 2d at 908.

**PLAINTIFF HAS FAILED TO PROVE THAT PAYMENTS UNDER THE REDEMPTION AGREEMENT WERE NOT MADE OUT OF SURPLUS**

16. "Surplus" is defined by section 102 of the BCL as the excess of net assets over stated capital. That section further defines "net assets" as the amount by which assets exceed liabilities.

17. It is well established that a corporation cannot prove lack of surplus based on the corporation's balance sheet, and instead must demonstrate the actual value of the corporation's assets. Vowteras, 83 A.D.2d at 836.

18. Balance sheets do not "take into account a re-evaluation of the [corporation's] furniture, fixtures and equipment" and are therefore insufficient. See id. Consideration of such intangibles and of corporate good will is appropriate. Rehberger, 2008 U.S. Dist. LEXIS 27045 at *9; see also 14 N.Y.Jur.2d, Business Relationships, ¶301.

19. The motivation for this principle is that, if insolvency were only based upon a corporation's financial statements, "a trial would be a sterile playlet." Baxter v. Lancer

Industries, Inc., 213 F. Supp. 92, 95 (E.D.N.Y. 1963). Consideration of actual values is "preferable as a safeguard against possible manipulation of balance sheet items to show no surplus . . . as valuation and reserves, are fixed by the directors of the corporation." Id. (citing Hornstein, Corporation Law and Practice 195 (1959)).

20. At the insolvency hearing, the Plaintiff failed to show that the Debtor's liabilities exceeded its assets, and therefore lacked the required surplus, at the time payments were made under the Agreement.

21. Mr. Sandler testified that his opinion was based solely upon books and records maintained by the Debtor and upon calculations he made using those records as his baseline.

22. However, Mr. Sandler absolutely failed to lay any foundation for the introduction of testimony based upon the books. The Debtor's books and records, the contents of which are the basis of Mr. Sandler's testimony and which he alleges are true, are nothing more than hearsay. While Mr. Sandler's record-based testimony may have been offered under the "business record" exception, Mr. Sandler never laid the necessary foundation required by Federal Rule of Evidence 803(6). See United States v. Mendel, 746 F.2d 155, 166 (2d Cir. 1984). Accordingly, Mr. Sandler's testimony should not be considered as it is entirely based on records which have not been properly authenticated.

23. Alternatively, Mr. Sandler's testimony should be given no weight because of the unreliability of the records upon which it is based.

24. Mr. Sandler testified that he did nothing to independently verify the accuracy of the contents of the books and records.

25. This is extremely problematic because the Debtor's books and records were replete with inaccuracies. There were also several records that Mr. Sandler was unable to review,

such as inventory records, because the Debtor failed to maintain any such records. In those instances, Mr. Sandler employed unreliable formulas in a desperate attempt to reach valuations needed to complete his report. As such, Mr. Sandler's opinion is only as credible as the books and records upon which it is based, which are grossly unreliable.

26. With respect to the materials upon which he relied, Mr. Sandler testified as follows:

Q: What documents were you provided with, Mr. Sandler?

A: By the trustee or in total?

Q: In total.

A: Okay. I was provided, and if necessary I'm going to request if I can go through a list that I have, but from memory I would tell you that I received the petition and schedule from the trustee. I received some documents in the trustee's file that related to a redemption agreement, which is the Arbore redemption agreement.

I went to the debtor's premises and was shown through the files and told where I could obtain paid and unpaid bills, which I removed ultimately. I was shown – given the names of the debtor's accountant who conducted – who handled the debtor's books and records pre-filing Chapter 11 and the firm that was retained during the Chapter 11 period. And then after speaking and meeting with them I ultimately received, for periods from 2002 through September '05, various QuickBooks trial balances, general ledgers, monthly operating reports. During the pendency of the Chapter 11 I received from form 1120S, the U.S. corporation subchapter S tax returns for the years 2001, 2, 3, 4 and 4 and for the most part those are the documents I recall receiving. (Tr. ¶¶ 42:25-43:21).

\*\*\*

27. Despite having reviewed and relied upon the aforementioned records, Mr. Sandler testified that he did nothing to verify the accuracy of their contents. In fact, Mr. Sandler testified that he did not audit, review or compile the Debtor's books and records (Tr. ¶¶ 105:16-105:25). Mr. Sandler simply did a "comparison" of the books and records (Tr. ¶¶ 105:22-105:23), in which he compared the various documents prepared by the Debtor or accountants employed by the Debtor to each other to "determine that they actually did contain the same information." (Tr. ¶¶106:21-107:107).

28. Mr. Sandler also admitted that he did not even consider intangibles (Tr. 132:5-133:15), notwithstanding the well-settled principle that intangibles bear upon solvency under BCL §513. See Rehberger, 2008 U.S. Dist. LEXIS 27045 at *9; see also 14 N.Y.Jur.2d, Business Relationships, ¶ 301.

29. Further, Mr. Sandler testified that the information he obtained from the Debtor's accountant, Alan Goodman, had not been audited, reviewed or compiled by Mr. Goodman (Tr. ¶¶ 99:4-100:6).

30. Accordingly, any conclusions drawn by Mr. Sandler are only as accurate as the records maintained by the Debtor. Mr. Sandler acknowledged this, admitting that records are "only as accurate as the person keeping [them]" (Tr. ¶¶ 107:7-107:10).

31. These conclusions are therefore disconcerting, as Mr. Sandler testified extensively as to the inaccurate nature of the Debtor's records, and as to the dearth of records that would have permitted him to have made calculations as to the values of the Debtor's assets and liabilities.

32. For example, Mr. Sandler was not provided with certain information regarding accounts payable, accounts receivable, and inventory. More specifically, Mr. Sandler testified as to the incompleteness of the Debtor's books as follows:

Q: From those documents of the debtor's that you reviewed, do you recall whether there were any accounts receivable of the debtor?

A: I inquired as to whether there are accounts receivable and I was told there are not and I could not find any record of accounts receivable.

Q: Were you aware of any accounts payable of the debtor?

A: I was not aware of any accounts payable of the debtor, other than the filing date. (Tr. ¶¶ 47:10-47:24).

\*\*\*

Q: Mr. Sandler, did the -- do you know whether the debtor maintained perpetual inventory records?

A: I inquired and was told by the debtor and the two accountants that no perpetual inventory records were maintained.

Q: Were you ever provided with perpetual inventory records?

A: I requested the debtor and the two accountants for copies of any work papers or inventory records and everyone told me that there were none. (Tr. ¶¶ 68:15-68:23).

\*\*\*

Q: And again, you weren't able to verify the inventory? There were no source documents or records regarding the inventory of the company, correct?

A: At what time period?

Q: Anything that you've reviewed from – well, let me ask you this question? What records of – for what time period did you read records of the company?

A: I've reviewed records, as I stated –

Q: You reviewed or read?

Q: I read – thank you. My liability carrier appreciates that. I read records going back from 2002, as I've described previously.

Q: And you came across nothing that would be able to support the inventory amounts that were stated on the records of the company, correct?

A: Nothing that supports the inventory that the company stated. That's correct. (Tr. ¶¶ 136:5-136:21).

\*\*\*

33. In addition to the information that was lacking for Mr. Sandler's review, the books and records produced contained various inaccuracies. Most notably, the Debtor's inventory valuations on its books were inaccurate because actual records of inventory had never been maintained. In the absence of records, Mr. Sandler testified that the Debtor instead relied upon the "gross profit method" in order to assign a value to inventory:

Q: Mr. Sandler, what is your understanding of how the debtor calculated its inventory?

A: I inquired of the two accountants and they said that –

A: The accountants said that they would call up the principal of the debtor, Mr. Gartner, and ask him how much the inventory was at the end of the period, whether it was a year or the monthly operating statement and he would tell them what the inventory was.

Q: So what was your understanding of how the debtor calculated its inventory?

A: My understanding is that the debtor used something called the gross profit method. (Tr. ¶¶ 68:3-68:14).

\*\*\*

34. According to Mr. Sandler, the gross profit method "is where the – where the principal or the person who's going to provide the inventory number is told what the sales are, what the opening inventory is, how much the purchases are and is then told how much inventory you have to have in order to have a certain gross profit percentage" (Tr. ¶¶ 69:17-69:22).

35. While the gross profit method can be used for monthly financial statements when a physical inventory is not feasible, "it is no substitute for an annual physical inventory." "What is the Gross Profit Method?" *available at* http://blog.accountingcoach.com/gross-profit-method-estimate-inventory (last visited Feb. 10, 2010) (emphasis added).

36. In fact, Courts have recognized that the gross profit method is inaccurate and cannot be relied upon where a corporation does not keep perpetual inventory records. Specifically, the U.S. Bankruptcy Court for the District of Massachusetts District found that "the inaccuracy of the estimated gross profit method of accounting ha[s] been demonstrated over and over again" in a case where the debtor did not maintain perpetual inventory records. Brandt v. Hicks, Muse & Co., 195 B.R. 971, 978 (D. Mass. 1996). The Court found that "[u]tilization of a gross profit method . . . requires a system of internal inventory controls to be in place so that current inventory can be accurately computed" and that the method is unreliable in the absence of such a system. Id.

37. Because the Debtor did not maintain perpetual inventory records (Tr. ¶¶ 136:5-136:___), the valuation of its inventory using the gross profit method proved unreliable.

38. Mr. Sandler acknowledged inaccuracies resulting from the Debtor's use of this method, but then purported to have "fixed" those errors by plugging a different gross profit margin into the same gross profit method calculation (Tr. ¶¶ 86:25-88:23). However, Mr. Sandler cannot simply rectify the problem with using the gross profit method by changing the gross profit margin. The very use of the gross profit method is improper because of the lack of perpetual inventory records. The Debtor did not simply rely on the gross profit method from time-to-time or for monthly trial calculations but, according to Mr. Sandler, relied solely upon the gross profit method in operating its business.

39. As the use of the method is unreliable under these circumstances, the values assigned by Mr. Sandler to Debtor's inventory using this method must not be relied upon.

40. That the method employed by Mr. Sandler resulted in an undervaluation of the Debtor's inventory is further evidenced by the fact that Mr. Sandler valued Debtor's inventory at virtually the same amount that the inventory ultimately sold for at a bankruptcy auction. More specifically, Mr. Sandler testified as follows:

Q: Did you do a visual inspection of the debtor's inventory?

A: Yes, I did.

Q: What did you observe?

A: I was at the debtor's premises a number of times, first with Mr. Thaler. Went through the showroom, the warehouse and the lots where the trailers were. Did a visual inspection with Mr. Thaler and in fact somebody from the auctioneer's office, I think David Maltz.

I was also there four or five days trying to find records that would assist in the administration of the case and I was there twice for two different auctions that were held. And in each case I saw a showroom and warehouse that were substantially full of merchandise. In the


showroom it was both on the mail level and in a mezzanine level that was build there. And in the warehouse I saw stacked pallets in row after row that was stocked with merchandise.

Q: And do you recall what the inventory sold for at the auction that you attended?

A: There were two auctions, to the best of my recollection, and I think—and I believe, if I remember correctly although I can refer to a document that the aggregate was approximately 600,000 dollars for the auction that was held in November.

Q: And is that consistent with the value of the inventory on the debtor's petition and schedules as before you?

A: Yes, it is because the debtor's petition reflected inventory in the 500 plus thousand dollar range .... (Tr. ¶¶ 72:12-73:13).

\*\*\*

41. Despite Mr. Sandler's claim that the auction's proceeds provide support for the accuracy of the value he assigned to Debtor's inventory, it is well known that items are sold at bankruptcy auctions for fractions of their actual cost.

42. In fact, the Defendant's expert, Mr. Serotta, testified that sales at inventory auctions are not indicative of the retail or wholesale value of the inventory sold:

Q: What sustainable information would be required in order for Mr. Sandler to adjust the gross profit one way or the other, either upwards or downwards?

A: Accurate inventories. But in any way relying on the cumulative four-year inventory, without knowing what went into that inventory computation that everything is based on. You know, for example, there was an auction sale. I've attended a lot of Mr. Maltz's auction sales. And I wasn't at this one. But normally the inventory goes for pennies on the dollar, okay? It

doesn't go at retail or wholesale. It's usually sold in bulk to dealers. And, you know, I think, sometimes if he's lucky, it gets fifty cents on the dollar.

I wasn't there, and I don't know what happened in this inventory. But based on my experience, okay, it never sells for full price; never sells for more, okay; and usually sells at a pretty steep discount.

Q: Have you ever attended an auction where the merchandise as a whole has gone for its fair-dollar value?

A: I don't know what fair-dollar value means. But I've never attended an auction where it goes for anything like accounting value, the value on the books of the company, which is usually the cost. (Tr. ¶¶ 160:15-161:4).

\*\*\*

43. In short, Mr. Sandler's opinion as to the existence of surplus from which Debtor could have made payments under the Agreement is fundamentally flawed for a variety of reasons.

44. Mr. Sandler did not independently confirm the accuracy of the numbers contained in the Debtor's books and records, which were the sole basis for his opinion.

45. Mr. Sandler also lacked any documentation with respect to accounts payable, receivable and inventory, rendering his analysis of the Debtor's overall financial incomplete.

46. In the absence of that information, Mr. Sandler attempted to fill in gaps by relying upon the gross profit formula to reach certain valuations.

47. The use of the gross profit formula for a final valuation is inappropriate; it is simply a tool used in practice for monthly estimates.

48. Moreover, it is settled that the results yielded by this method are inaccurate in the absence of supporting perpetual inventory records.

49. As such, Mr. Sandler's expert testimony failed to prove the Debtor's insolvency or lack of surplus at any time the Debtor made payments under the Agreement and judgment must be entered in favor of the Defendants.

## CONCLUSION

Based on the foregoing, it is respectfully requested that this Court find that Poseidon Pool & Spa Recreational, Inc. was solvent as of May 24, 2002 and on each and every date thereafter upon which a payment was made to Vincent Arbore or his successor-in-interest under the Redemption Agreement.

Dated: Garden City, New York
February 24, 2010

Respectfully submitted,

JASPAN SCHLESINGER LLP
Attorneys for Petitioner

By: *Linda S Agnew*
Linda S. Agnew (LSA 5947)
300 Garden City Plaza
Garden City, New York 11530
(516) 746-8000