UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
In re                                                    **Chapter 7**

POSEIDON POOL & SPA                                      **Case No. 805-87603-478**
RECREATIONAL, INC.,                                     **Hon. Dorothy T. Eisenberg**

                                    Debtor.
--------------------------------------------------------------------X
ANDREW M. THALER, Trustee,                              **Adversary Proceeding**
Estate of POSEIDON POOL & SPA                           **No. 806-8222-478**
RECREATIONAL, INC.,

                                    Plaintiff,

            - against -

ESTATE OF VINCENT J. ARBORE, Deceased,
DIANE ARBORE, in her capacity as Executrix
of the Estate of Vincent J. Arbore, DIANE
ARBORE, ANN ARBORE, PETER ARBORE,
JAYVIN ARBORE, ALLISON ARBORE,
MICHAEL ARBORE, KATHERINE ARBORE,
ALAN ARBORE, JAMES ARBORE, ROSA
DINICOLO and RITA CANNILLO,

                                    Defendants.
--------------------------------------------------------------------X


### DEFENDANTS' PROPOSED
### SUPPLEMENTAL FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

JASPAN SCHLESINGER LLP
Attorneys for Petitioner
300 Garden City Plaza
Garden City, NY 11530
(516) 746-8000

Defendants, the Estate of Vincent J. Arbore, Diane Arbore, as Executrix of the Estate of Vincent Arbore, Diane Arbore, individually, Ann Arbore, Peter Arbore, Jayvin Arbore, Allison Arbore, Michael Arbore, Alan Arbore, Katherine Arbore, and James Arbore ("Arbore Defendants"), by their attorneys, Jaspan Schlesinger LLP, electronically filed their Proposed Findings of Fact and Conclusions of Law on February 24, 2010 at approximately 6:00pm. The Arbore Defendants' submission was timely filed pursuant to the direction of Hon. Dorothy T. Eisenberg that the parties' Proposed Findings of Fact and Conclusions of Law be submitted within thirty (30) days of the January 25, 2010 hearing on the issue of insolvency, to wit, by February 24, 2010. The Plaintiff filed his Proposed Findings of Fact and Conclusions of Law untimely on February 25, 2010 at approximately 9:00pm. Due to his lateness, Plaintiff had the benefit of reviewing the Arbore Defendants' submission in crafting his Proposed Findings of Fact and Conclusions of Law. On March 1, 2010, the Arbore Defendants submitted a letter application requesting leave to submit Supplemental Findings of Fact and Conclusions of Law in order to restore the parties to an equal position. On March 2, 2010, the Plaintiff submitted a responsive letter voicing no objection to the Arbore Defendants' request. On March 3, 2010, Hon. Dorothy T. Eisenberg's chambers notified counsel for the Arbore Defendants by telephone that their application had been granted. The within Supplemental Findings of Fact and Conclusions of Law are submitted pursuant thereto.

## PRELIMINARY STATEMENT

1.      The Arbore Defendants will continue to use the following defined terms that were set forth in their original submission:

(a) "Mr. Sandler" refers to the Plaintiff's expert witness, Bernard J. Sandler, an accountant.

(b) "Mr. Serotta" refers to the Defendant's expert witness, Brian Serotta, an accountant.

(c) "Arbore" refers to Vincent J. Arbore, former shareholder of Poseidon Pool & Spa Recreational, Inc.

(d) "Agreement" refers to the Redemption Agreement entered into by Vincent J. Arbore and Poseidon Pool & Spa Recreational, Inc. on May 24, 2002.

(e) "Debtor" refers to Poseidon Pool & Spa Recreational, Inc.

(f) "Tr." refers to the transcript of the hearing on the issue of insolvency held on January 25, 2010 before Hon. Dorothy T. Eisenberg.

## PROPOSED FINDINGS OF FACT

1.      The Arbore Defendants repeat and reallege each proposed finding of fact contained in their original submission dated February 24, 2010.

## CONCLUSIONS OF LAW

A.      The Debtor Is Only Required to be Solvent at the Date of Execution and Is Not Required to have Surplus on Hand Sufficient to Cover the Entire Purchase Price At That Time

1.      Under New York Business Corporation Law ("BCL") § 513, a redemption agreement which provides that the purchase price be paid in installments is valid so long as the corporation is not insolvent at the time of execution nor rendered insolvent by the agreement. See In re Flying Mailmen Service, Inc., 402 F. Supp. 790, 795 (S.D.N.Y. 1975); see also Rehberger v. MRW Group, Inc., 2008 U.S. Dist. LEXIS 27045, *7 (E.D.N.Y. 2008).

2.     The Plaintiff insinuates at page 17 of his submission that BCL § 513 was violated because the amount of surplus on-hand at the date of the Agreement's execution was less than the full purchase price under the Agreement. More specifically, Plaintiff points out that, at the date of execution the Debtor allegedly had a surplus of about $300,000 while Arbore's shares were redeemed for a total purchase price of $450,000. Of the total price, $50,000 was due at execution and the remainder was to be paid in monthly installments of $6,500.

3.     Contrary to the Plaintiff's suggestion, it is not necessary that the corporation have sufficient surplus to cover the entire purchase price at the date of execution of a redemption agreement when the full price is not then due and owing. A redemption agreement's validity is contingent only upon the corporation being solvent at the date of execution. See In re Flying Mailmen Service, Inc., 402 F. Supp. 790, 795 (S.D.N.Y. 1975).

4.     Insolvency is defined as a corporation's inability to pay debts as they become due in the usual course of business. Bus. Corp. Law § 102 (a)(8) (2010) (emphasis supplied).

5.     The Plaintiff has failed to offer even a shred of evidence to suggest that, on the date of execution the Debtor was insolvent, that is to say that the Debtor was unable to pay its debts as they came due in the usual course of business. Accordingly, the Plaintiff has failed to meet its burden of proving insolvency as of the date of execution and, by extension, has failed to prove that the Agreement was invalid.

6.     The issue of surplus relates only to the enforceability of a valid redemption agreement. If, after execution, the corporation's surplus becomes insufficient to cover payments under the agreement, the agreement becomes unenforceable though it remains valid. See Cross v. Beguelin, 226 A.D. 349, 235 N.Y.S. 336, (1st Dep't 1929) ("The contract itself, therefore, was perfectly legal subject to certain limitations upon its enforceability. If when the time came [the

corporation] had a sufficient surplus the contract would be enforced. If it had not the contract could not be enforced.") (citations omitted); Nakano v. Nakano McGlone Nightingale Adver., Inc., 84 Misc. 2d 905, 908, 377 N.Y.S.2d 996, 1000 (Sup. Ct. New York Cty. 1975) (noting that agreement to purchase or redeem stock is "both valid and legal, subject to the stated limitations on its enforceability" where "[i]f a surplus existed at the time of the agreement disappears, or shrinks to a deficit, the agreement is rendered unenforceable").

7.      Even if a redemption agreement becomes unenforceable because the corporation's surplus becomes a deficit, enforceability can be restored when the corporation regains its surplus. See Mantell v. Unipak Aviation Corp., 28 A.D.2d 1134, 284 N.Y.S.2d 640 (2d Dep't 1967) (modifying award to shareholder plaintiff to the extent that the payments received under the redemption agreement "shall be limited to years in which a surplus is available for that purpose").

8.      Accordingly, the only relevant issue herein with respect to the amount of surplus on-hand at the time of execution is whether sufficient surplus existed to cover the $50,000 payment made at execution.

9.      As a preliminary matter, the Plaintiff bases his claim as to the amount of surplus on hand at the date of execution upon the Debtor's 2001 tax return. Plaintiff later attacks the contents of the Debtor's tax returns, claiming that the gross profit reported in the 2002, 2003 and 2004 tax returns was inaccurate. Plaintiff has impeached the reliability of his own testimony by relying on the tax returns to determine the amount of surplus at the date of execution while subsequently claiming that information from the tax returns is incorrect.

10.     Assuming, *arguendo*, that the amount reflected in the 2001 tax return was actually the amount of surplus on hand at the date of execution, it is of no moment that the surplus

amount was less than the total amount of the outstanding debt. Assuming the Debtor had approximately $300,000 of surplus on hand at execution, the surplus is sufficient to cover the $50,000 down payment made at that time.

11.    That being the case, the Plaintiff's suggestion that a surplus of less than $450,000 at the date of execution would have been problematic is without merit and must be disregarded. The Agreement was both valid and enforceable at that time.

B.    The Plaintiff Has Failed to Show that the Gross Profit Method is Appropriate in Valuing Inventory for Purposes of Determining Debtor's Solvency

12.    Plaintiff's claim at page 20 of its submission that the gross profit method of valuing inventory is "widely used by accountants and auditors and regularly accepted by the Courts in situations to determine inventory values where only estimates are needed or where either inventory or inventory records have been destroyed or do not exist" is inaccurate and unavailing.

13.    It is well-settled that the gross profit method for valuing inventory is inappropriate where a Debtor's insolvency is at issue, because it "is far from a precise way of deriving an inventory figure." It's only generally accepted use is by a corporation as an internal measure "to close their monthly books, for in this connection an approximate figure is adequate." In re KDI Corp., 2 B.R. 503, 512 (S.D. Oh. 1980). That this method frequently yields results that are actually inaccurate, especially when a corporation has no inventory controls, has been demonstrated time and again. Id. at 515 (finding that a corporation's inventory values were "highly inaccurate" because they were "prepared for internal purposes by the gross profit method . . . [and no] thought was given in its preparation to following generally accepted accounting principles. Accounting procedures at the company at that time were primitive, and there were

little or no controls."); see also Brandt v. Hicks, Muse & Co., 195 B.R. 971, 978 (D. Mass. 1996).

14.     The Plaintiff misconstrues the cases upon which he relies to support his position that the gross profit method is accurate and well-accepted. In re Checkmate Stereo & Electronics, Ltd., 9 B.R. 585 (Br. E.D.N.Y. 1981), is not a case in which the gross profit method was employed to determine whether a Debtor was insolvent. In fact, the court found that there was "no question" that the Debtor was insolvent at the time its President and sole shareholder was alleged to have fraudulently transferred the Debtor's assets. Id. at 592. Instead, the task before the Court was to determine which of the Debtor's assets had not been turned over to the bankruptcy trustee. With respect to inventory, the Court was forced to rely upon the gross profit method to determine how much of the Debtor's inventory had not been turned over. The Debtor's sole shareholder claimed that all inventory records had been stolen, leaving the Court with no choice but to estimate. Because the use of the gross profit method was necessitated by the shareholder's own wrongdoing, the Court found that the Debtor's sole shareholder could not attack the Court's adoption of figures reached by using the inaccurate method.

15.     If Checkmate supports any proposition, it is that the Arbore Defendants should not be bound to an inaccurate inventory value reached by employing the gross profit method, because they have not committed any wrongdoing. Here, the only wrongdoers are the Debtor and its principals, who committed malfeasance and nonfeasance in their record-keeping practices. It is also notable that the Debtor and its principals now claim that Debtor was insolvent from the date of execution of the Agreement despite having represented in writing that the Debtor was solvent at that time. The Court should reject the inventory values offered by Mr. Sandler, and all calculations based upon those values, and find that Plaintiff has failed to satisfy its burden of

proving insolvency. A contrary conclusion would cause the Arbore Defendants to shoulder the consequences of wrongdoings they did not commit.

16.     Similarly misguided is Plaintiff's reliance on Puro v. Puro, 82 A.D.2d 749, N.Y.S.2d 15 (1st Dept 1981). Puro concerns the valuation of shareholder's stock as it relates to the exercise of a stock purchase option. The terms of the purchase provided that an accountant would determine the stock value using generally accepted accounting practices. There was a dispute as to the value of the corporation's inventory for two relevant dates. A physical inventory had been conducted approximately two years after the relevant dates, and an accountant used the gross profit method to "work-back" to estimate the inventory values at the relevant earlier dates. The Court adopted the figure reached using this method, stating that it appeared to be the most reliable figure of several offered by various experts employing different methods.

17.     Puro is distinguishable from the case at bar in several respects. First, Puro has nothing to do with the use of the gross profit method to value inventory as part of a determination of a Debtor's insolvency. The issue was, instead, the appropriate purchase price for stock. Employing estimate figures in that case has effects that are significantly less far-reaching than it does here, where the Plaintiff seeks to recover several hundreds of thousands of dollars paid to the Arbore Defendants. Second, the accountant in Puro had the benefit of taking a physical inventory at a later date and working back from that point. There are no physical inventories or records that would permit such a work-back in this case. Finally, the accountant in Puro estimated the inventory value for only two legally significant dates, whereas here Mr. Sandler has attempted to estimate the inventory value to reach a conclusion about the Debtor's financial condition for each month of several years. Accordingly, Puro provides no support

whatsoever for the Plaintiff's claim that the use of the gross profit method has been relied upon by courts in cases such as the instant matter.

18. Finally, Plaintiff's reliance upon <u>Purity-Reiss Candy Co. v. Maryland Cas. Co.,</u> 128 So. 2d 677, 679 (La. Ct. App. 1961) is also erroneous. <u>Purity-Reiss,</u> concerns a burglary and the plaintiff's subsequent use of the gross profit method to claim a reasonable amount of loss resulting therefrom. The Court found that the use of the method and the number resulting therefrom was reasonable, specifically stating that in the case of a burglary all the injured party must provide is a "reasonable" estimate as opposed to a certain value. Similarly, as in <u>Checkmate,</u> the figure reached using the gross profit method is used against a party who has committed wrongdoing; specifically, the damages charged against the burglar can be estimated because it is the very act of burglary that has necessitated the use of the method in the first instance.

19. The instant matter does not concern a burglary and is therefore entirely distinguishable from <u>Purity-Reiss.</u> Further, as discussed *supra*, the Arbore Defendants have not committed any wrongdoing herein that would warrant holding them to an unreliable estimate reached by the gross profit method.

20. Accordingly, the Court should reject the inventory values offered by Mr. Sandler and find that the Plaintiff has failed to meet his burden of proving insolvency and lack of sufficient surplus at the legally significant dates.

C. Plaintiff's Claim that the Debtor's Annual Gross Profit Margin Should Be Reduced for Each of the Relevant Years is Without Merit

21. Mr. Sandler testified that a gross profit of approximately 28% was listed in the Debtor's 2002, 2003 and 2004 tax returns, and a gross profit of approximately 12% was listed in the Debtor's 2005 tax return. (Tr. 54:16-55:12).

22.    Mr. Sandler claimed that the only possible explanation for the difference in gross profit in 2005 and the 3 prior years was that the gross profit had been misstated in 2002, 2003 and 2004. Mr. Serotta, however, testified that this assumption is unsound. (Tr. 156:14-158:1).

23.    Mr. Serotta pointed out that "there is no basis in accounting for just saying if the gross profit in the last year of operation is different, that should be retroactively applied to all prior periods. But more importantly, Mr. Sandler did nothing to check out why the gross profit was that much lower in the '05 period. For example, there could have been any huge number of changes in the business model, reaction to financial difficulties the company was having. And for any one of numerous reasons, the gross profit could be lower in that year." (Tr. 157:12-157:21).

24.    Not only did Mr. Sandler fail to investigate other causes of the decrease in gross profit in 2005, but Mr. Serotta testified that it would have been impossible for Mr. Sandler to have determined the gross profit for each year because of the dearth of records available. (Tr. 158:18-159:4).

25.    The only way of ascertaining whether any other such circumstances occurred would have been to have examined the Debtor's principals and to have sought out additional records. Nonetheless, the Plaintiff did not call them the principals to testify, although those potential witnesses were within the Plaintiff's control and Plaintiff bore the burden to produce them. There is simply no way of knowing if an alternate explanation applies because of Plaintiff's failure to call these witnesses.

26.    The Plaintiff should not be permitted to insulate himself from further explanations by presenting the incomplete guesswork of a sole witness.

27.    As such, it is not possible that the Plaintiff has proven that it is more likely than not that the Debtor's gross profit margin should have been decreased over every single relevant

period, and relatedly that the value of Debtor's inventory should be drastically decreased in every relevant period.

D.  Mr. Sandler's Testimony Should Be Given Little Weight Because He Relied Upon Trial Balances That Were Blatantly Unreliable

28.  Plaintiff, at paragraph 37 and pages 18, 19, 24 of its submission, indicate that the records relied upon by Mr. Sandler consisted of the Debtor's trial balances and tax return.

29.  Mr. Sandler's heavy reliance on the Debtor's trial balances is inappropriate.

30.  Mr. Serotta testified that such reliance cannot support a conclusion within a reasonable degree of professional certainty that the Debtor was insolvent at any time prior to filing for bankruptcy. More, specifically, Mr. Serotta stated: "Mr. Sandler relied heavily on trial balances. And trial balances are just that. It's a trial. It's the beginning – I don't mean trial in a legal sense, okay. It's the beginning point of doing accounting. It's not the end point. Sort of, you could almost say trial balances are the end of bookkeeping and the beginning of accounting. And apparently no accounting was done, proven out by the fact that, as you questioned Mr. Sandler before the inventories haven't changed; the accounts payable haven't changed. They are purely raw numbers, okay, that are not, I believe, looked at by an accountant. Definitely not adjusted in any way by an accountant. And even then, you still come out with equity all the way through June 30th, '03, after a major adjustment made by Mr. Sandler to gross profit, as I said before, that I feel, to a very large extend, was not based on accurate assumptions." (Tr. 159:18-160:7).

31.  With respect to the Mr. Serotta's testimony that inventories and accounts payable had not changed, Mr. Serotta refers to Mr. Sandler's testimony that, for for the years 2002, 2003, 2004 and 2005, the Debtor's trial balances showed an inventory value for each quarter of each year was identical to all other quarters of the same year (Tr. ¶¶ 117:16-122:7).

32. Similarly, the Debtor's books and records reflected baseless identical valuations of accounts payable over each quarter of every year. For example, Mr. Sandler testified that the accounts payable were valued at $513,900 for December 31, 2001, March 31, 2002, June 30, 2002, and September 30, 2002 (Tr. 122:8-122:21). The accounts payable were also valued identically for each quarter in 2003, 2004 and 2005. (Tr. 122:22-123:17).

33. All of these numbers are unsupported by any documentation, as Mr. Sandler testified that the Debtor never produced and he never read any documentation regarding accounts payable or receivable and maintained no perpetual inventory records. (Tr. 129:18-129:20).

34. Not only did Mr. Serotta testify that these numbers are inaccurate, but Mr. Sandler himself testified that these figures were implausible:

Q: We have the inventory, and the inventory hasn't changed one iota in four periods?

A: That's what the Debtor says.

Q: That's what the Debtor says?

A: Right.

Q: Okay. And in your many years of experience as an accountant, does this seem plausible to you?

A: Not at all. (Tr. 119:15-119:21).

35. It is impossible that Mr. Sandler's conclusions can be sound, when the figures upon which they are based are "not at all plausible" according to Mr. Serotta and to Mr. Sandler himself.

36. Mr. Sandler's testimony should, therefore, be considered by this Court as not credible.

E.  The Arbore Defendants Were Not Required to Draw Conclusions About Debtor's Solvency or Surplus on Hand

37.     At page 26 of his submission, the Plaintiff states that the Arbore Defendants "have offered no valuation of their own or an expert report with respect to whether the Debtor had sufficient surplus to purchase its shares from the Decedent or whether the Debtor was insolvent or would be rendered insolvent from the purchase at any time from the date the Redemption Agreement was signed in May 2001 [sic] through the Filing Date. Specifically, Defendants' rebuttal expert offered no testimony as to whether the Debtor had sufficient surplus or was solvent at any time it was making the requisite payments under the Redemption Agreement and did not submit an expert report in that regard. The Defendants have not offered into evidence at the trial of this matter any written evidence to rebut the expert report of Bernard Sandler."

38.     First and foremost, it is not the Arbore Defendants' burden to prove that the Debtor was solvent or had sufficient surplus. Rather, the Plaintiff bears the burden of showing that the Debtor was insolvent and lacked surplus. Where a corporation fails to satisfy that burden, judgment must be entered for the shareholder irrespective of what evidence he may or may not have offered. See Nakano v. Nakano McGlone Nightingale Adver., Inc., 84 Misc. 2d 905, 908, 377 N.Y.S.2d 996, 998 (Sup. Ct. New York Cty. 1975) ("Where such proof is lacking, "it is incumbent upon the trial judge to award judgment to the shareholder") (emphasis added).

39.     Additionally, it is the Debtor's complete lack of necessary records that prevented the Arbore Defendants from having an expert testify to the Debtor's solvency or surplus. Put another way, the Debtor's misfeasance and nonfeasance precluded the Arbore Defendants from being able to offer any such testimony.

40.     This lack of records also precluded the Plaintiff from being able to offer sound expert testimony as to Debtor's solvency and surplus. The testimony offered was scraped together from books and records that can be described as inaccurate and incomplete at best.

41.     Mr. Sandler's opinion is simply just as inaccurate as the materials upon which it is based and should not be held to have proven by a preponderance of the evidence to have established the Debtor's pre-petition insolvency or lack of surplus.

## CONCLUSION

Based on the foregoing, it is respectfully requested that this Court find that Poseidon Pool & Spa Recreational, Inc. was solvent as of May 24, 2002 and on each and every date thereafter upon which a payment was made to Vincent Arbore or his successor-in-interest under the Redemption Agreement.

Dated: Garden City, New York
      March 8, 2010

Respectfully submitted,

JASPAN SCHLESINGER LLP
Attorneys for Petitioner

By: _Linda S. Agnew_
      Linda S. Agnew (LSA 5947)
      300 Garden City Plaza
      Garden City, New York 11530
      (516) 746-8000