UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re:

Poseidon Pool & Spa Recreational, Inc.

Debtor.
----------------------------------------------------------x
Andrew M. Thaler, Trustee,
Estate of Poseidon Pool & Spa
Recreational, Inc.,

                Plaintiff,

            - against -

Estate of Vincent J. Arbore, Deceased,
Diane Arbore, in her capacity as Executrix
of the Estate of Vincent J. Arbore, Diane
Arbore, Ann Arbore, Peter Arbore, Jayvin
Arbore, Allison Arbore, Michael Arbore,
Katherine Arbore, Alan Arbore, James
Arbore, Rosa Dinicolo and Rita Cannillo,

                Defendants.
----------------------------------------------------------x

Case No.: 8-05-87603-478

Chapter 7

Adversary Proceeding No. 8-06-8222-478

**MEMORANDUM DECISION**

*Appearances:*

Kim D. Victor, Esq.
*Attorney for Plaintiff Trustee*
Thaler & Gertler, LLP
90 Merrick Avenue, Suite 400
East Meadow, New York 11554

Linda S. Agnew, Esq.
*Attorney for Defendants*
Jaspan Schlesinger Hoffman LLP
300 Garden City Plaza
Garden City, New York 11530

Honorable Dorothy T. Eisenberg, United States Bankruptcy Judge

The limited issue before the Court at this time is whether the Debtor had adequate surplus funds to purchase its shares, or was insolvent or rendered insolvent during the period from when the Debtor and Vincent J. Arbore entered into the redemption agreement at issue in May of 2002 and at any time thereafter when payments were being made pursuant to such redemption agreement. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334. This contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), and (O) and 11 U.S.C. §§ 541, 544, 548 and 550, and § 270 et seq. of the NEW YORK DEBTOR AND CREDITOR LAW and § 513 of the NEW YORK BUSINESS CORPORATION LAW. The following constitutes the Court's findings of fact and conclusions of law as mandated by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## FACTS

The Debtor was a corporation that sold pools, spas and related items to retail customers. Vincent Arbore ("Abore") was an employee, officer and director of the Debtor. Arbore was also a shareholder of the Debtor with a one-third ownership interest. On or about May 24, 2002, Arbore, the Debtor and the Debtor's other shareholders entered into an agreement whereby the Debtor agreed to redeem Arbore's ten shares of common stock in the Debtor which represented his entire ownership interest in the Debtor in exchange for $450,000.00 (the "Redemption Agreement"). The Debtor paid Arbore $50,000.00 upon execution of the Redemption Agreement and executed a promissory note in the amount of $400,000.00 (the "Note") with 10% interest per annum which was secured by the stock repurchased by the Debtor and a Guarantee and Pledge Agreement executed by the Debtor and the other shareholders of the Debtor. The Note provided, *inter alia*, that the Debtor would pay Arbore in installments of $6,500 per month

commencing on June 24, 2002 and ending no later than May 24, 2007 for Arbore's sale of his

stock. On May 24, 2002, Arbore resigned his position as employee, officer and director of the

Debtor.

Arbore died in September of 2002. After Arbore's death, all payments due under the

Redemption Agreement and the Note were paid to his estate, the Defendants in this adversary

proceeding. The Debtor made payments under the Redemption Agreement and the Note from

June 2002 to August 2005.

The Debtor filed for chapter 11 bankruptcy relief on October 7, 2005 (the "Petition

Date"). In its bankruptcy petition and schedules, the Debtor listed $541,501.62 in assets and

$3,937,364.25 in liabilities as of the Petition Date. The Debtor subsequently amended its

petition to include an additional $750,000 of general unsecured liabilities. Debtor's liabilities

included unpaid prepetition sales tax owed on a quarterly basis to the State of New York as

follows as set forth in a proof of claim filed by the state:

| Period Ending | Tax | Penalty | Interest |
|---|---|---|---|
| May 31, 2003 | $62,240.72 | $ 0.00 | $14,042.58 |
| August 31, 2003 | $15,746.94 | $ 4,723.89 | $ 7,997.82 |
| November 30, 2003 | $11,502.66 | $ 3,460.66 | $ 5,842.16 |
| February 29, 2004 | $7,686.00 | $ 2,305.80 | $11,580.81 |
| May 31, 2004 | $9,784.60 | $ 2,935.26 | $ 4,952.60 |
| August 31, 2005 | $122,940.00 | $36,881.62 | $47,321.26 |
| November 30, 2005[1] | $43,903.63 | $ 0.00 | $ 0.00 |

On June 8, 2006, the Debtor commenced this adversary proceeding against the

Defendants seeking the return of payments made by the Debtor to Arbore and his estate pursuant

to the Redemption Agreement within one year of the Debtor's bankruptcy filing on the grounds

---

[1] A portion of this sale tax liability may be with respect to the postpetition liability as the Petition Date falls within the sales tax reporting period ending on November 30, 2005.

that the Debtor received no consideration in exchange for the payments under the Redemption

Agreement, that the Debtor was insolvent commencing on or about January 1, 2005 and the

payments were made at a time when the Debtor was insolvent, thereby rendering the payments

fraudulent or voidable transfers under, *inter alia*, 11 U.S.C. § 544 and 550, NEW YORK DEBTOR

AND CREDITOR LAW § 270 et. al. and NEW YORK BUSINESS CORPORATION LAW §513(a).  Under

the Debtor's complaint, it sought to recover only 10 payments made from January 1, 2005 to the

Petition date.

Andrew Thaler, Esq., was appointed the Chapter 11 Operating Trustee on September 12,

2006.  The case was subsequently converted to a chapter 7 on the Operating Trustee's motion on

September 21, 2006 and Mr. Thaler was appointed as the Chapter 7 trustee (the "Trustee"). Upon

conversion of the case, the Trustee was replaced as the plaintiff of this adversary proceeding.

The Trustee's analysis of the Debtor's financial condition with the assistance of his accountant,

Bernard J. Sandler, CPA, of Sandler, Rosengarten, Denis & Berger, LLP, led the Trustee to

conclude that the Debtor was financially insolvent during the entire time the Debtor made

payments under the Redemption Agreement (i.e., commencing from June 24, 2002 to the

Petition Date).  Accordingly, the Trustee sought to amend the Debtor's complaint and avoid all

the payments made under the Redemption to Arbore and his estate since June 24, 2002.  After a

hearing on the Defendants' objection to the Trustee's motion to amend, the Court granted the

Trustee's motion authorizing the filing of the amended complaint.

An evidentiary hearing on the issue of whether the Debtor was insolvent from May 2002

to the Petition Date was held on January 25, 2010 at which time the Trustee's accountant

testified.  Brian A. Serotta, CPA testified as a rebuttal expert witness on behalf of the

Defendants.

In conducting his investigation, the Trustee's accountant obtained the Debtor's books and records, spoke with the Debtor's principals, accountants and an employee of the Debtor who was in charge of the Debtor's records at the premises, and viewed the Debtor's premises and warehouse inventory. The Debtor's books and records consisted of the debtor's accounting records that were maintained on software known as "Quick Books", quarterly trial balances from December 31, 2001 to September 30, 2005, including a trial balance as of May 31, 2002, which was seven days after the execution of the Redemption Agreement, and trial balances for years 2001 through 2004 and annual general ledgers, which were provided by the Debtor's prepetition accountant, Goodman Associates. In addition, the Debtor's books and records included the Debtor's tax returns for the years 2002 through 2005. In preparing his expert report, the Trustee's accountant not only read the books and records of the Debtor but also took into account the deposition testimony of the Debtor's prepetition accountant, Alan Goodman, CPA, and the Debtor's postpetition accountant, Harold Korcarz, CPA.

As indicated on the Debtor's 2002 tax return, the Debtor's opening balance sheet as of January 1, 2002 reflected an earned surplus of $308,900. When the Debtor entered into the Redemption Agreement and Note to purchase Arbore's stock in the company for $450,000, the Debtor did not have sufficient funds to pay the entire purchase price. While an earned surplus of $308,900 at the beginning of the year may indicate that the Debtor may have been in a position to make installment payments under the Redemption Agreement and the Note at the time of execution of this agreement, as discussed below, both the Trustee and the Defendants agreed at the evidentiary hearing that the Debtor's books and records on their face are inaccurate, though

4

there is a dispute as to the extent of such inaccuracies and whether such inaccuracies would affect the surplus reflected in the Debtor's books and records for 2002 and any period thereafter to the Petition Date.

The first inaccuracy in the Debtor's books and records is evidenced by the prepetition inventory levels and accounts payable reported on the Debtor's books and records remaining unchanged for months at a time.

| Period ending | Inventory | Accounts Payable |
|---|---|---|
| December 31, 2001 to September 30, 2002 | $ 806,500 | $513,900 |
| December 31, 2002 | $1,155,000 | $710,900 |
| March 31, 2003 | $ 806,500 | $513,900 |
| June 30 to September 30, 2003 | $1,300,000 | $828,400 |
| December 31, 2003 to September 30, 2004 | $1,223,500 | $751,000 |
| December 31, 2004 to September 30, 2005 | $2,016,200 | $1,553,200 |

For the period ending September 30, 2005, the Debtor's books and records indicated $2,008,400 in assets consisting of $2,016,200 in inventory, ($27,000) in cash, and $19,200 in other assets, and only $1,902,100 in liabilities.

Yet, a week after September 30, 2005, the Debtor listed on its bankruptcy schedules, which were signed under penalties of perjury, $541,501.62 in assets of which $363,001.62 consisted of inventory, and $3,937,364.25 in liabilities as of the Petition Date. The Debtor's postpetition inventory levels fluctuated approximately between $388,000 and $521,000 from the Petition Date until the end of March 2006. In April 2006, the Debtor's inventory approached $ 1 million and remained slightly above $1 million through July 2006, the last month for which an operating report was filed by the Debtor. The increase in inventory levels during the summer months in 2006 was consistent with the seasonal nature of the Debtor's business, whereas the inventory levels on the Debtor's prepetition books and records remained the same throughout

most of each year at issue without reflecting a decrease for the off season. Soon after the case was converted, the Debtor's inventory was sold at two public auction sales held in October of 2006 which generated total proceeds of $684,565.75.

One of the reasons for the discrepancy is that the Debtor did not maintain perpetual inventory records prepetition. It appears that the Debtor calculated its ending inventory using the gross profit method. The gross profit method is:

> [a] method of estimating ending inventory. Purchases are added to ending inventory in order to calculate goods available for sale. The estimated gross profit margin is multiplied by sales and the result is subtracted from net sales to estimate cost of goods sold. The cost of goods sold is subtracted from cost of goods available for sale to determine the cost of ending inventory. The gross profit method is suitable for interim reports, but not for annual financial statements.

David L. Scott, The American Heritage Dictionary of Business Terms 234 (2009). During the period of 2002 through 2005, the Debtor's books and record consistently reported inventory using a gross profit of 28% each year. The Debtor's tax returns show a gross profit percentage of 28% for years 2002 through 2004 and only 12% for year 2005 as opposed to 28%. The drastic difference with respect to the Debtor's inventory levels between what was stated in its books and records for the months leading up to the Petition Date and what was stated on its bankruptcy petition indicates that the Debtor's prepetition inventory levels as shown on its books and records were overstated at least for those several months prepetition.

Aside from the inaccuracy of the Debtor's recording of its inventory levels and accounts payables, the Debtor recorded its monthly payment of $6,500 to Arbore and the Defendants under the Redemption Agreement on its books and records as a reduction of principal only. The Debtor did not allocate any portion of the payment between principal and interest as required

under the Redemption Agreement and the Note. This resulted in the interest expense not being

recorded on the Debtor's tax returns and the liability with respect to the outstanding principal

under the Note being reduced at a rate faster than the amortization schedule.

In addition, the Debtor also failed to record sales tax liability for certain quarters and

improperly recorded all customer deposits for merchandise as actual sales instead of liabilities,

regardless of whether the customer actually took title to the merchandise or whether the Debtor

had the merchandise in inventory. The Trustee's accountant did not have sufficient information

to make an adjustment for these errors but noted that each of these errors or omissions would

artificially inflate the Debtor's assets and net worth and most likely further reduce and deplete

the surplus, if any.


## DISCUSSION

Pursuant to NEW YORK BUSINESS CORPORATION LAW § 513(a),

> [n]otwithstanding any authority contained in the certificate of incorporation, the
> shares of a corporation may not be purchased by the corporation, or, if
> redeemable, convertible or exchangeable shares, may not be redeemed, converted
> or exchanged, in each case for or into cash, other property, indebtedness or other
> securities of the corporation (other than shares of the corporation and rights to
> acquire such shares) if the corporation is then insolvent or would thereby be made
> insolvent. Shares may be purchased or redeemed only out of surplus.

N.Y. BUS. CORP. LAW §513 (McKinney 2003). Section 102(a)(8) of the N.Y. BUS. CORP. LAW

defines "insolvent" as "being unable to pay debts as they become due in the usual course of the

debtor's business". See also In re Industrial Ceramics, Inc., 253 B.R. 323, 332 (Bankr.

W.D.N.Y. 2000). Section 102(a)(13) of the N.Y. BUS. CORP. LAW defines "surplus" as "the

excess of net assets over stated capital". A transfer of assets made by a corporate debtor in

violation of N.Y. BUS. CORP. LAW § 513(a) is avoidable under section 544(b) of the Bankruptcy Code. Le Café Creme, Ltd. v. Le Roux (In re Le Café Creme, Ltd.), 244 B.R. 211, 243-44 (Bankr. S.D.N.Y. 2000). " A corporation may not make installment payments to purchase its own shares of stock whem it is insolvent or would be rendered insolvent". Id., 244 B.R. 244.

The Trustee needs to demonstrate that the Debtor was insolvent by a preponderance of the evidence at the time the Redemption Agreement and Note was entered into on May 2002 or for any period thereafter up to the Petition Date in order to avoid the payments made by the Debtor to Arbore and the Defendants under the Redemption Agreement and Note during the relevant periods. Grogan v. Garner, 498 U.S. 279, 286 (1991). "There is no presumption one way or another as to the existence of a surplus." Nakano v. Nakano McGlone Nightingale Advertising, Inc., 84 Misc.3d 905, 908 (N.Y. Sup. Ct. 1975)(quoting Murphy v. George Murphy, Inc., 7 Misc. 2d 647, 650 (N.Y. Sup. Ct. 1957). A determination of insolvency, whenever possible, should be based upon appraisals or expert testimony but "appraisals are neither the exclusive or dispositive means to make the determination." Lawson v. Ford Motor Company (In re Roblin Indus., Inc.), 78 F.3d 30, 38 (2d Cir. 1996).

As discussed above, the Debtor did not maintain perpetual inventory records but estimated its ending inventory for a particular period using the gross profit method which resulted in the Debtor's inventory levels being overstated. From 2002 to 2005, the Debtor's books and records reflected approximately 28% gross profit for each of those years with a discrepancy of 12% being reported in the Debtor's 2005 tax return. The Trustee's accountant testified that the use of the gross profit method by the Debtor likely overstated the Debtor's inventory levels year after year until the Debtor's bankruptcy filing at which point the Debtor

8

had to determine approximately how much inventory it actually did have for purposes of disclosing its assets and liabilities under the Bankruptcy Code. The Debtor's postpetition inventory levels reported in its monthly operating reports for the months after the bankruptcy filing were much lower than what the Debtor reported for the previous years in question.

To determine a more accurate gross profit percentage for 2002 through 2005, the Trustee's accountant obtained the average gross profit percentage for that period. This was done by taking the $6,389,300 in cumulative gross profit reported for the combined four year period and dividing that by the $26,711,200 in total sales reported by the Debtor for the same period. The resulting average gross profit percentage was 23.92% which was approximately 4.69% lower than what was reported in the Debtor's books and records for 2002 to 2005. He then adjusted the Debtor's gross profit for each quarter of 2002 to 2005 by the 4.69% difference which results in a reduction in the Debtor's recorded inventory levels and a corresponding reduction in the surplus recorded for those quarters. The Trustee asserts that the 4.69% downward adjustment in the gross profit percentage was conservative and reasonable in light of additional errors contained in the Debtor's books and records, such as the failure to record sales tax liability for certain quarters and the improper recording of all customer deposits as actual sales instead of liabilities, which would have reduced and depleted the Debtor's surplus earlier in time.

In addition, with respect to the Debtor's monthly payment of $6,500 to Abore and the Defendants under the Redemption Agreement and Note, the Trustee's accountant allocated a portion of the $6,500 monthly payment as an interest expense as required under the Redemption Agreement and Note. This allocation reduces the Debtor's equity and therefore reduces the

9

recorded surplus on the Debtor's books and records for each quarter from 2002 through 2005. Without the reduction for interest expense, by September 2005 the Debtor's net worth and liquidity would be overstated by $100,300, the aggregate sum of the interest expense under the Redemption Agreement and Note. When the reduction of equity due to the allocation of the interest expense is taken into account along with the reduction in inventory and gross profit as a result of the decrease in the Debtor's gross profit percentage by 4.69%, the Debtor's adjusted books and records show not a surplus but a deficit of ($228,398) starting from around July 1, 2003 and that deficit continued to expand to the Petition Date. This deficit from July 1, 2003 does not take into consideration the Debtor's liability for the payment of principal under the Redemption Agreement and Note.

If the Debtor's liability for the payment of principal under the Redemption Agreement and Note were taken into account along with adjustments to the Debtor's books and records for gross profit, inventory, and the interest expense with respect to the payments under the Redemption Agreement and Note, the Trustee's accountant states that the Debtor would start showing a deficit at the quarter ending June 30, 2002 of approximately ($2,344) with increasing deficits for each quarter thereafter to the Petition Date. Under this analysis, he concludes that the Debtor did not have a surplus and was insolvent at the time the Debtor entered into the Redemption Agreement and Note and for every month thereafter to the Petition Date.

In addition to the methodology of adjusting for gross profit, inventory and the payments under the Redemption Agreement Note described above, the Trustee's accountant also undertook two alternative analysis. Under the first alternative, he noted that there was more than a $3,000,000 deficit in stockholder's equity as of December 31, 2005 and used the Debtor's books

and records to adjust the stockholder's equity/deficit for all preceding periods by rolling back the $3,000,000 deficit through those periods. He concludes under this roll back methodology that the Debtor's $3,000,000 deficit in stockholder equity as of December 31, 2005 arose as a result of operating losses sustained from January 1, 2002 through September 30, 2005 and the payments made under the Redemption Agreement and the Note. However, there is no explanation as to how the adjustments were made in terms of rolling back the deficit and how much of the deficit was allocated to each preceding period. The Court therefore gives this theory little to no consideration.

Under the second alternative, the Trustee's accountant attempted to determine what was the stockholder's equity at the time of the execution of the Redemption Agreement. Under this method, he noted that the Debtor reported earned surplus as of January 1, 2002 of $310,000 and a net profit of approximately $79,000 on its 2002 tax return on sales of $5,298,700. Using the reported sales for the period that ended April 30, 2002 and reported operating expenses for the year, he determined that the Debtor's incurred operating expenses at a rate of approximately $120,000 per month. Based upon the Debtor's "historic maintained gross profit margin of 23.92%" for the 4 year period in question, he concluded that the Debtor would have incurred a loss of $141,300 from January 1, 2002 through April 30, 2002, the month prior to the execution of the Redemption Agreement and Note. This loss would have reduced the earned surplus to $168,700.

Based upon the various methodologies undertaken for valuing the Debtor's assets and liabilities, the Trustee's accountant concludes that the Debtor had a deficit in accumulated earnings during the period starting July 1, 2003 which continued thereafter to the Petition Date.

11

Given the many inaccuracies in the Debtor's books and records as discussed above and if further adjustments were made to take into account some of the additional inaccuracies other than items relating to inventory levels, gross profit and the failure to allocate interest expense on the redemption payments, the Trustee's accountant concludes that the Debtor was insolvent or rendered insolvent when the Redemption Agreement and Note were entered into.

While the Debtor may have failed to properly record the actual inventory levels, accounts payable, interest payments made under the Redemption Agreement and Note, and certain sales tax owed in its various trial balances, general ledgers and tax returns, the Defendants do not dispute that these are nonetheless the business records of the Debtor which the Court must consider and evaluate in its determination on the issue of insolvency. Although the Defendants argue that one cannot determine with any certainty that the Debtor was insolvent as a result of the inaccuracies found in the Debtor's books and records, the Trustee only needs to show by a preponderance of the evidence that the Debtor was insolvent during the periods in question and need not show the exact dollar amount of such insolvency.

Defendants attacked the calculations of the Debtor's insolvency by the Trustee's accountant on the basis that the calculations were based upon inaccurate books and records maintained by the Debtor given the fact that the Debtor never maintained inventory records and the  accounts payables remained unchanged for months at a time. However, the Defendant's accountant agrees that in order for the Debtor to actually have 28% gross profit remain the same year after year without evidentiary support is an unlikely scenario and the Defendants do not dispute that the use of the gross profit method by the Debtor to determine the level of inventory without maintaining perpetual inventory records can be unreliable. While the Defendants find

12

fault in some of the assumptions made by the Trustee's accountant in arriving at the reduced

gross profit percentage of 23.92%, they have not offered any evidence or expert testimony to

show what would be the more appropriate measure of the Debtor's inventory levels, gross profit,

equity and surplus.  Similarly, the Defendants' argument that the Trustee's accountant failed to

factor in the value of intangibles and goodwill can be given only little weight because the

Defendants did not demonstrate that the Debtor had any intangibles and goodwill that should be

considered and whether these items, if any, had value such that it would offset some of the

adjustments made by the Trustee's accountant.

Indeed, the Defendants have not submitted any evidence to rebut the testimony and

analysis by the Trustee's accountant that the Debtor was insolvent as of July 1, 2003 or perhaps

prior to July 1, 2003 when the Redemption Agreement was entered into.  None of the

Defendants' arguments has shown that the Debtor was indeed solvent at least from July 1, 2003

up to the Petition Date, other than the surplus shown on the Debtor's unadjusted books and

records.  If the Court were to grant the Defendants relief based upon their assertions that the

Debtor's books and records, inaccurate as they may be, should be taken at face value, such

reliance by the Court would reward the Defendants for inaccurate, unreliable and questionable

record keeping by the Debtor.  The Court refuses to do so and believes that the analysis by the

Trustee's accountant is supported by the record when all the financial information is taken into

consideration.

After reviewing the evidence and the documents filed in this bankruptcy case and

adversary proceeding and upon consideration of the testimony of the expert witnesses, the Court

finds there is sufficient evidence to show that the Debtor was insolvent for at least a part of the

years in question. The Court finds that the allocation by the Trustee's accountant of the monthly payments of $6,500 between principal and interest and the corresponding adjustments to the Debtor's books and records is reasonable. While the Court finds that some reduction or downward adjustment in the Debtor's gross profit percentage, inventory, and surplus levels is appropriate, it is unclear whether an across the board reduction of 4.69% for the entire period of 2002 through 2005 would accurately reflect the Debtor's solvency or insolvency during this period. Yet, when taken into consideration with some of the alternative methodologies undertaken by the Trustee's accountant and the fact that the Debtor consistently failed to pay its quarterly sales tax liability for the period ending May 31, 2003 and continuing for most of the months leading up to the Debtor's bankruptcy filing as evidenced by the proofs of claim filed by the State of New York, there is evidentiary support for the Court to find that the Debtor did not have a surplus and was indeed insolvent from at least July 31, 2003 and thereafter.

In addition, a review of the other proofs of claim filed in this bankruptcy case shows that many of the claims against the Debtor arose in 2004 and 2005. The Debtor's inability to pay its ongoing sales tax liability and other debts from July 1, 2003 to the Petition Date is clear and undisputed evidence of the Debtor's inability to pay its debts as they became due in the usual course of business during this period. Accordingly, the Court finds that the Trustee has proven by a preponderance of the evidence that the Debtor was insolvent from July 1, 2003 to the Petition Date under N.Y. BUS. CORP. LAW § 513(a).

For the period from May 24, 2002 to June 30, 2003, there is no other evidence with respect to whether the Debtor had a deficit other than the adjustments to the Debtor's books and records as made by the Trustee's accountant. As discussed above, the Court questions the

14

appropriateness of applying an across the board reduction in the Debtor's gross profit for 2002 to 2005 by 4.69% based upon the average gross profit percentage for such 4 year period to determine the surplus/deficiency levels from May 24, 2002 to June 30, 2003 given the inaccuracies found in the Debtor's books and records.  While the Trustee's accountant concludes that the Debtor was probably insolvent during the period prior to July 1, 2003 given that further downward adjustments to reported surplus aside from interest payments and inventory levels may be warranted, there is a lack of support given for what those adjustments may be and whether such adjustments would be reasonable.  More importantly, there is an absence of corresponding evidence showing that the Debtor was unable to pay its debts as they became due during the ordinary course of business from May 24, 2002 to about June of 2003.  Given this uncertainty and based upon the evidence presented to the Court, the Court cannot find by a preponderance of the evidence that the Debtor was insolvent  under section 513(a) of N.Y. Bus. Corp. Law § 513(a) from May 24, 2002 through June 30, 2003.

CONCLUSION

Based upon the foregoing, the Court finds by a preponderance of the evidence that the Debtor was insolvent or rendered insolvent from July 1, 2003 and thereafter but is unable to find that the Debtor was insolvent from May 24, 2002 to June 30, 2003 under section 513(a) of N.Y. Bus. Corp. Law.

A continued pre-trial conference in this adversary proceeding shall be held on October 26, 2010 at 10:00 a.m.



**Dated: Central Islip, New York**
        **September 30, 2010**

**Dorothy Eisenberg**
**United States Bankruptcy Judge**